**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Case No.: ____________________**

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY CO.,

Plaintiffs,

-v-

TAMPA BAY SERVICES GROUP LLC, ISMARY PADRON, TREAT & RELEASE CTR INC. d/b/a THE SPINE THEORY, YOMIRIS RODRIGUEZ ORTA, AL WILLIAM ROBAINA, M.D., CLIFFORD JAMES RAYMOND, M.D., H&S REHABILITATION CENTER, INC., GUILLERMO SUAREZ, L.M.T., RODOLFO HUMPIERRE, MJ REHABILITATION CENTER CORP., WILLIAN SUAREZ JIMENEZ, BODY & SOUL MEDICAL CENTER INC., ADIAN LINARES, VICTOR AUGUSTO SILVA, M.D., MARTA ROSA FERNANDEZ, M.D., and EVAN TEPPER, M.D.,

Defendants.
_____________________________________/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively,

"GEICO" or "Plaintiffs") hereby allege as follows:

1. This action seeks to recover more than $5,900,000.00 that the Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Tampa Bay Services Group LLC ("Tampa Bay Services"), Treat & Release Ctr Inc., d/b/a The Spine Theory ("Treat & Release"), H&S Rehabilitation Center, Inc. ("H&S Rehab"), MJ Rehabilitation Center Corp. ("MJ Rehab"), and Body & Soul Medical Center Inc. ("Body & Soul") (collectively, the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow-up examinations, extracorporeal shockwave therapy ("ESWT"), home medical equipment ("HME"), and chiropractic and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful no-fault PIP claims that the Defendants have submitted through the Clinic Defendants because:

(i) at all relevant times, Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance

Claims Statute"), and Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act");

(ii) the underlying Fraudulent Services were not medically necessary, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received the Fraudulent Services;

(iii) in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv) the Defendants' billing for the Fraudulent Services misrepresented the nature, extent, results, and medical necessity of the Fraudulent Services, in order to fraudulently inflate the charges submitted to GEICO;

(v) the Defendants unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed individuals; and

(vi) the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3. As set forth below, the Defendants – at all relevant times – have known that the PIP insurance billing they submitted through the respective Clinic Defendants was fraudulent, unlawful, and ineligible for reimbursement for the reasons set forth herein.

4. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through the Clinic Defendants to GEICO.

5. The charts attached as Exhibits "1" - "5" set forth large, representative examples of the fraudulent claims that have been identified to date that the Defendants

have submitted through the respective Clinic Defendants to GEICO.

6. The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $5,900,000.00.

## I. Plaintiffs

7. Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II. Defendants

8. Defendant Tampa Bay Services is a Florida limited liability company with its principal place of business in Tampa, Florida. Tampa Bay Services was organized in Florida on or about February 27, 2020, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9. At all relevant times, Tampa Bay Services falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact operated the clinic in violation of the Cinic Act.

10. Tampa Bay Services falsely purported to have Defendant Evan Tepper, M.D. ("Tepper") as its medical director at all relevant times, but in fact Tepper did not perform the required duties of a clinic medical director at Tampa Bay Services.

11. Defendant Ismary Padron ("Padron") resides in and is a citizen of Florida. Padron owned, controlled, and was the member of Tampa Bay Services at all relevant times, and used Tampa Bay Services as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12. Defendant Treat & Release is a Florida corporation with its principal place of business in Tampa, Florida. Treat & Release was incorporated in Florida on or about February 20, 2019, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13. At all relevant times, Treat & Release falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact operated the clinic in violation of the Cinic Act.

14. Treat & Release falsely purported to have Defendant Al William Robaina, M.D. ("Robaina") as its medical director from October 2020 to May 2024, Defendant Clifford James Raymond, M.D. ("Raymond") as its medical director from May 2024 to January 2025, and Defendant Tepper as its medical director from January 2025 to the present, but in fact Robaina, Raymond, and Tepper did not perform the required duties of a clinic medical director at Treat & Release.

15. Defendant Yomiris Rodriguez Orta ("Orta") resides in and is a citizen of Florida. Orta owned and controlled Treat & Release at all relevant times, and used Treat & Release as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

16. Defendant H&S Rehab is a Florida corporation with its principal place

of business in Tampa, Florida. H&S Rehab was incorporated in Florida on or about February 28, 2017, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17. At all relevant times, H&S Rehab falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact operated the clinic in violation of the Cinic Act.

18. H&S Rehab falsely purported to have Defendant Tepper as its medical director at all relevant times, but in fact Tepper did not perform the required duties of a clinic medical director at H&S Rehab.

19. Defendants Guillermo Suarez, L.M.T. ("Suarez") and Rodolfo Humpierre ("Humpierre") reside in and are citizens of Florida. Suarez was licensed as a massage therapist in Florida on or about February 2, 2011. Suarez and Humpierre owned and controlled H&S Rehab at all relevant times, and used H&S Rehab as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

20. Defendant MJ Rehab is a Florida corporation with its principal place of business in Riverview, Florida. MJ Rehab was incorporated in Florida on or about June 14, 2024, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

21. At all relevant times, MJ Rehab falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact operated the clinic in violation of the Cinic Act.

22. MJ Rehab falsely purported to have Defendant Tepper as its medical director at all relevant times, but in fact Tepper did not perform the required duties of a clinic medical director at MJ Rehab.

23. Defendant Willian Suarez Jimenez ("Jimenez") resides in and is a citizen of Florida. Jimenez owned and controlled MJ Rehab at all relevant times, and used MJ Rehab as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

24. Defendant Body & Soul is a Florida corporation with its principal place of business in Tampa, Florida. Body & Soul was incorporated in Florida on or about July 19, 2019, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

25. At all relevant times, Body & Soul falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact operated the clinic in violation of the Cinic Act.

26. Body & Soul falsely purported to have Defendant Victor Augusto Silva, M.D. ("Silva") as its medical director from February 2021 to April 2023, Defendant Raymond as its medical director from April 2023 to May 2024, Defendant Marta Rosa Fernandez, M.D. ("Fernandez") as its medical director from May 2024 to June 2025, and Defendant Tepper as its medical director from June 2025 to present, but in fact Silva, Raymond, Fernandez, and Tepper did not perform the required duties of a clinic medical director at Body & Soul.

27. Defendant Adian Linares ("Linares") resides in and is a citizen of

Florida. Linares owned and controlled Body & Soul at all relevant times and used Body & Soul as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

28. Defendant Tepper resides in and is a citizen of Florida. Tepper was licensed to practice medicine in Florida on or about June 11, 1991, and falsely purported to serve as medical director at each of the Clinic Defendants.

29. Defendant Robaina resides in and is a citizen of Florida. Robaina was licensed to practice medicine in Florida on or about October 27, 1994, and falsely purported to serve as medical director at Treat & Release.

30. Defendant Raymond resides in and is a citizen of Florida. Robaina was licensed to practice medicine in Florida on or about May 13, 2022, and falsely purported to serve as medical director at Treat & Release and Body & Soul.

31. Defendant Silva resides in and is a citizen of Florida. Silva was licensed to practice medicine in Florida on or about October 27, 1999, and falsely purported to serve as medical director at Body & Soul.

32. Defendant Fernandez resides in and is a citizen of Florida. Fernandez was licensed to practice medicine in Florida on or about June 19, 2004, and falsely purported to serve as medical director at Body & Soul.

## III. Other Relevant Entities and Individuals

33. Although GEICO does not currently name them as Defendants in this Complaint, Tige Andrew Travis (“Travis”), Elimerys Mora Machado (“Machado”),

Osvaldo Alvrez ("Alvarez"), Plariel John Tordilla ("Tordilla"), and Joy Violeta Wilson ("Wilson") are also relevant to understanding Plaintiffs' claims in this action.

34. Travis is licensed to practice chiropractic in Florida, was employed by or associated with Tampa Bay Services and H&S Rehab, and purported to perform Fraudulent Services on behalf of Tampa Bay Services and H&S Rehab.

35. Machado and Alvarez are licensed in Florida as advanced practice registered nurses, were employed by or associated with Treat & Release, and purported to perform Fraudulent Services on behalf of Treat & Release.

36. Tordilla is licensed to practice chiropractic in Florida, was employed by or associated with H&S Rehab, and purported to perform Fraudulent Services on behalf of H&S Rehab.

37. Wilson is licensed to practice chiropractic in Florida, was employed by or associated with MJ Rehab, and purported to perform Fraudulent Services on behalf of MJ Rehab.

## JURISDICTION AND VENUE

38. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

39. The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

40. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

41. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I. Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

42. Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

43. Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

44. In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

45. Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative

requirements of state and federal law related to the provision of medical services or treatment."

46. Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

47. Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

48. Pursuant to the Clinic Act, and subject to certain limited exceptions that are inapplicable in this case, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

49. Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

50. In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and

unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

51. Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

52. In addition, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

53. Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

54. Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

55. Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that

operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

56. Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

57. Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

58. Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

59. Pursuant to the No-Fault Law, "medically necessary" means:

> a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:
>
> (i) in accordance with generally accepted standards of medical practice;
>
> (ii) clinically appropriate in terms of type, frequency, extent, site, and duration; and
>
> (iii) not primarily for the convenience of the patient, physician, or other health care provider.

60. Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

61. However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

62. Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

63. Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

64. Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i) for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii) to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii) with respect to a bill or statement that does not substantially meet the

billing requirements set forth in the No-Fault Law.

65. The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

66. The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

67. To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

68. Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II. <u>The Defendants' Interrelated Fraudulent and Unlawful Schemes</u>

69. Beginning in at least 2020, and continuing through the present day, the

Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A. The Defendants' Violations of the Clinic Act

70. Because the Clinic Defendants were health care clinics subject to the Clinic Act: (i) Padron could not operate Tampa Bay Services; (ii) Orta could not operate Treat & Release; (iii) Suarez and Humpierre could not operate H&S Rehab, (iv) Jimenez could not operate MJ Rehab, and (v) Linares could not operate Body & Soul unless they obtained clinic licenses for their respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

71. However, if the Clinic Defendants retained legitimate physicians to serve as their medical directors, any such physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent schemes.

72. Accordingly:

(i) Padron recruited Tepper, a licensed physician, who was willing to falsely pose as the legitimate medical director at Tampa Bay Services, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii) Orta recruited Robaina, Raymond, and then Tepper, licensed physicians who were willing to falsely pose as the legitimate medical directors at Treat & Release, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iii) Suarez and Humpierre recruited Tepper, a licensed physician, who was

willing to falsely pose as the legitimate medical director at H&S Rehab, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iv) Jimenez recruited Tepper, a licensed physician, who was willing to falsely pose as the legitimate medical director at MJ Rehab, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(v) Linares recruited Silva, Raymond, Fernandez, and then Tepper, licensed physicians who were willing to falsely pose as the legitimate medical director at Body & Soul, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic.

73. Tepper, Robaina, Raymond, Silva, and Fernandez were never genuine medical directors for their respective Clinic Defendants.

74. Instead, throughout Tepper, Robaina, Raymond, Silva, and Fernandez' associations with each of their respective Clinic Defendants, they ceded all day-to-day decision-making and oversight regarding health care services at the respective Clinic Defendants, and the resulting billing, to the respective Clinic Defendants' owners.

75. In keeping with the fact that Tepper, Robaina, Raymond, Silva, and Fernandez were never genuine medical directors at any of the Clinic Defendants, they never legitimately conducted systematic reviews of the respective clinics' billings to ensure that the billings were not fraudulent or unlawful, and instead permitted the clinics to operate in the fraudulent and unlawful manner described herein.

76. What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Tepper, Robaina, Raymond, Silva, and Fernandez never provided legitimate, day-to-day supervision at any of the Clinic Defendants and – in fact – they only occasionally were present at the

respective clinics during their purported tenures as "medical directors", if at all.

77. In the claims identified in Exhibits "1" - "3", the Defendants falsely represented that the Clinic Defendants were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

78. In fact, the Clinic Defendants were never in compliance with the Clinic Act, and thus were never eligible to receive PIP reimbursement.

**B. The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at the Clinic Defendants, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners**

79. The Clinic Defendants billed for a range of purported health care goods and services, primarily consisting of examinations, HME, and physical therapy services including hot/cold packs, mechanical traction therapy, ultrasound therapy, therapeutic exercises, manual therapy, and electrical stimulation.

80. In the claims identified in Exhibits "1" - "5", the purported physical therapy services constituted the majority of the services that were billed through the respective Clinic Defendants to GEICO.

81. In the claims identified in Exhibits "1" - "5", the purported physical therapy services were unlawfully performed – to the extent they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including Aurea Exposito Marrero, L.M.T. ("Marrero"), Ivan Saavedra, L.M.T. ("Saavedra"), Alejandro Valdez Martinez, L.M.T. ("Martinez"), Leonard Manuel Lopez De La Torre, L.M.T. ("De La Torre"), Pedro Gutierrez, L.M.T. ("Gutierrez"), Suarez,

Jeymi Ramos-Martinez, L.M.T. ("Ramos-Martinez"), Yanessa Pais, L.M.T. ("Pais"), and Daniella Mora Rodriguez, L.M.T. ("Rodriguez").

82. In particular, Marrero and Gutierrez were employed by or associated with Tampa Bay Services, and purported to perform many of the Fraudulent Services on behalf of Tampa Bay Services.

83. Suarez, Ramos-Martinez, Saavedra, Martinez, and De La Torre were employed by or associated with Treat & Release, and purported to perform many of the Fraudulent Services on behalf of Treat & Release.

84. Saavedra, Pais, and De La Torre were employed by or associated with H&S Rehab and purported to perform many of the Fraudulent Services on behalf of H&S Rehab.

85. Rodriguez was employed by or associated with MJ Rehab, and purported to perform many of the Fraudulent Services on behalf of MJ Rehab.

86. The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists or unsupervised and unlicensed individuals.

87. As a result, and in order to conceal the fact that Marrero, Gutierrez, Suarez, Ramos-Martinez, Saavedra, Martinez, Pais, De La Torre, Rodriguez, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through the Clinic Defendants to GEICO, the Defendants deliberately omitted any reference to the massage therapists and unlicensed individuals associated with the Clinic Defendants

on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

88. Instead, in the claims for physical therapy services identified in Exhibits "1" - "5", the respective Defendants routinely and falsely listed Tepper, Machado, Robaina, Tordilla, and Silva in Box 31 of the HCFA-1500 forms as the supposed providers or direct supervisors of the physical therapy services.

89. In fact, Tepper, Machado, Robaina, Tordilla, and Silva – who were simultaneously purporting to perform large amounts of health care services at numerous health care practices at numerous locations – did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibits "1" - "5", and could not have legitimately performed or directly supervised the physical therapy services.

90. For example:

(i) On October 13, 2020, Robaina purported to personally perform – or at least directly supervise – at least 26 hours of physical therapy and related services that were provided to at least 10 different GEICO Insureds at Treat & Release.

(ii) On November 10, 2020, Robaina purported to personally perform – or at least directly supervise – at least 22.75 hours of physical therapy and related services that were provided to at least 12 different GEICO Insureds at Treat & Release.

(iii) On March 28, 2022, Silva purported to personally perform – or at least directly supervise – at least 58.5 hours of physical therapy and related services that were provided to at least 35 different GEICO Insureds at Body & Soul and four additional locations.

(iv) On June 13, 2022, Silva purported to personally perform – or at least directly supervise – at least 71.25 hours of physical therapy and related

services that were provided to at least 45 different GEICO Insureds at Body & Soul and four additional locations.

(v) On August 15, 2022, Silva purported to personally perform – or at least directly supervise – at least 63.5 hours of physical therapy and related services that were provided to at least 42 different GEICO Insureds at Body & Soul and four additional locations.

(vi) On September 12, 2022, Silva purported to personally perform – or at least directly supervise – at least 56.25 hours of physical therapy and related services that were provided to at least 35 different GEICO Insureds at Body & Soul and four additional locations.

(vii) On October 19, 2022, Tepper purported to personally perform – or at least directly supervise – at least 28.5 hours of physical therapy and related services that were provided to at least 18 different GEICO Insureds at Tampa Bay Services and H&S Rehab.

(viii) On October 25, 2022, Tordilla purported to personally perform – or at least directly supervise – at least 27.25 hours of physical therapy and related services that were provided to at least 9 different GEICO Insureds at H&S Rehab.

(ix) On November 16, 2022, Tordilla purported to personally perform – or at least directly supervise – at least 22.25 hours of physical therapy and related services that were provided to at least 10 different GEICO Insureds at H&S Rehab.

(x) On April 4, 2024, Machado purported to personally perform – or at least directly supervise – at least 26.25 hours of physical therapy and related services that were provided to at least 3 different GEICO Insureds at Treat & Release.

(xi) On May 6, 2024, Machado purported to personally perform – or at least directly supervise – at least 22.5 hours of physical therapy and related services that were provided to at least 13 different GEICO Insureds at Treat & Release and one additional location.

(xii) On June 10, 2024, Robaina purported to personally perform – or at least directly supervise – at least 27.5 hours of physical therapy and related services that were provided to at least 17 different GEICO Insureds at Treat & Release.

(xiii) On June 25, 2024, Robaina purported to personally perform – or at least directly supervise – at least 34.5 hours of physical therapy and related services that were provided to at least 13 different GEICO Insureds at Treat & Release.

(xiv) On August 20, 2024, Tordilla purported to personally perform – or at least directly supervise – at least 25.5 hours of physical therapy and related services that were provided to at least 11 different GEICO Insureds at H&S Rehab.

(xv) On September 5, 2024, Tordilla purported to personally perform – or at least directly supervise – at least 22.25 hours of physical therapy and related services that were provided to at least 10 different GEICO Insureds at H&S Rehab.

(xvi) On December 12, 2024, Machado purported to personally perform – or at least directly supervise – at least 28 hours of physical therapy and related services that were provided to at least 15 different GEICO Insureds at Treat & Release and one additional location.

(xvii) On January 7, 2025, Machado purported to personally perform – or at least directly supervise – at least 23 hours of physical therapy and related services that were provided to at least 14 different GEICO Insureds at Treat & Release and one additional location.

(xviii) On January 30, 2025, Tepper purported to personally perform – or at least directly supervise – at least 41.5 hours of physical therapy and related services that were provided to at least 23 different GEICO Insureds at Tampa Bay Services and Treat & Release.

(xix) On February 5, 2025, Tepper purported to personally perform – or at least directly supervise – at least 38 hours of physical therapy and related services that were provided to at least 21 different GEICO Insureds at Treat & Release and one additional location.

(xx) On March 11, 2025, Tepper purported to personally perform – or at least directly supervise – at least 31.25 hours of physical therapy and related services that were provided to at least 19 different GEICO Insureds at Tampa Bay Services and Treat & Release.

91. These are only representative examples. In the claims for physical therapy services that are identified in Exhibits “1” - “5”, the Defendants routinely

falsely represented that Tepper, Machado, Robaina, Tordilla, and Silva had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services they simultaneously were purporting to perform or directly supervise at other health care clinics at multiple locations on those same dates.

92. It is impossible that Tepper, Machado, Robaina, Tordilla, and Silva routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

93. Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

94. GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

95. It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers.

96. Thus, upon information and belief, the impossible number of physical therapy services that Tepper, Machado, Robaina, Tordilla, and Silva purported to directly supervise or provide to GEICO Insureds at the Clinic Defendants – and other clinics on individual dates of service, including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy

services that Tepper, Machado, Robaina, Tordilla, and Silva purported to perform or directly supervise on those same dates of service.

97. In the claims for physical therapy services identified in Exhibits "1" - "5", the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii) the Clinic Defendants could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unsupervised/unlicensed individuals, and because the clinics operated in violation of Florida law; and

(iii) the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

## C. The Defendants' Unlawful General Business Practice of Waiving PIP Deductibles from Their Patients

98. The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Clinic Defendants for medically unnecessary treatment.

99. Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in

violation of the False and Fraudulent Insurance Claims Statute.

100. In keeping with this fact, in almost all of the thousands of bills (i.e., the HCFA-1500 forms) submitted to GEICO through the Clinic Defendants for the Defendants' Fraudulent Services, the respective Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

101. In the claims identified in Exhibits "1" - "5", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

102. In this context, Tepper, who purported to be the medical director at each of the Clinic Defendants; Robaina and Clifford, who purported to be the medical directors at Treat & Release prior to Tepper; and Silva, Raymond, and Fernandez, who purported to be the medical directors at Body & Soul prior to Tepper, did not, and could not have, legitimately systematically reviewed the Clinic Defendants' billings to ensure that they were neither fraudulent nor unlawful.

103. Had Tepper, Robaina, Raymond, Silva, and Fernandez legitimately systematically reviewed the respective Clinic Defendants' billings to ensure that they were neither fraudulent nor unlawful, they would have noted – among other things – that the respective Clinic Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and

deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute, and they would have taken immediate corrective action.

**D. The Defendants' Fraudulent Treatment and Billing Protocols**

104. In the claims identified in Exhibits "1" - "5", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

105. Even so, in the claims identified in Exhibits "1" - "5", the Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary services to the Insureds who purportedly were subjected to the "treatment".

106. The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "5" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any significant continuing medical problems arising from any automobile accidents.

107. Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

108. No legitimate physician, health care practitioner, or clinic would permit

the fraudulent treatment and billing protocols described below to proceed under their auspices.

109. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

### 1. The Fraudulent Charges for Initial Examinations at the Clinic Defendants

110. As an initial step in the Defendants' fraudulent treatment and billing protocol, almost all of the Insureds in the claims identified in Exhibits "1" - "5" purportedly received an initial examination at Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, or Body & Soul, respectively.

111. In the claims identified in Exhibit "1", the substantial majority of the initial examinations at Tampa Bay Services were billed through Tampa Bay Services to GEICO under CPT code 99204, typically resulting in a charge of $350.00 for each purported examination.

112. In the claims identified in Exhibit "2", the substantial majority of the initial examinations at Treat & Release were billed through Treat & Release to GEICO under CPT codes 99203 and 99204, typically resulting in a charge of either $300.00 or $350.00 for each purported examination.

113. In the claims identified in Exhibit "3", the substantial majority of the initial examinations at H&S Rehab were billed through H&S Rehab to GEICO under CPT code 99203, typically resulting in a charge of $250.00 for each purported examination.

114. In the claims identified in Exhibit “4”, the substantial majority of the initial examinations at MJ Rehab were billed through MJ Rehab to GEICO under CPT code 99203, typically resulting in a charge of $350.00 for each purported examination.

115. In the claims identified in Exhibit “5”, the substantial majority of the initial examinations at Body & Soul were billed through Body & Soul to GEICO under CPT code 99203, typically resulting in a charge of $300.00 for each purported examination.

116. In the claims for initial examinations identified in Exhibits “1” - “5”, the charges for the initial examinations were fraudulent in that they misrepresented the Clinic Defendants’ eligibility to collect PIP Benefits in the first instance.

117. In fact, and as set forth herein, none of the Clinic Defendants was ever eligible to collect PIP Benefits, inasmuch as the clinics were operated in violation of Florida law.

118. As set forth below, the charges for the initial examinations identified in Exhibits “1” - “5” also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i) Misrepresentations Regarding the Severity of the Insureds’ Presenting Problems**

119. In the claims for initial examinations identified in Exhibits “1” - “5”, the Defendants routinely misrepresented the severity of the Insureds’ presenting problems.

120. As set forth herein, the No-Fault Law’s billing requirements provide that

all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

121. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

122. Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99203 to bill for an initial examination represents that the Insured presented with problems of low severity during the examination.

123. The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

(i) Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii) Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii) Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv) Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v) Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

124. Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute

problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

125. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the Insured presented with problems of moderate severity during the examination.

126. The CPT Assistant provides the following clinical examples of moderate severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

127. Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's

health, or even the patient's life.

128. By contrast, to the extent that the insureds in the claims identified in Exhibits "1" - "5" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

129. For instance, in most of the claims identified in Exhibits "1" - "5", the Insureds did not seek treatment at any hospital as the result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibits "1" - "5" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue diagnosis.

130. Furthermore, in most of the claims identified in Exhibits "1" - "5", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

131. Even so, in the claims for initial examinations identified in Exhibits "1" - "5", the respective Defendants billed for the examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of low severity or moderate severity.

132. For example:

(i) On January 7, 2021, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JE's vehicle did not deploy and that JE's vehicle was drivable

following the accident. The police report further indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured in the accident, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JE on January 11, 2021, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(ii) On March 7, 2021, an Insured named CE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CE's vehicle did not deploy and that CE's vehicle was drivable following the accident. The police report further indicated that CE was not injured and did not complain of any pain at the scene. In keeping with the fact that CE was not seriously injured in the accident, CE did not visit any hospital emergency room following the accident. To the extent that CE experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CE on March 15, 2021, Treat & Release, Orta, and Robaina billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(iii) On August 19, 2021, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JW's vehicle did not deploy and that JW was not injured and did not complain of any pain at the scene. In keeping with the fact that JW was not seriously injured in the accident, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JW on September 2, 2021, Body & Soul, Linares, and Silva billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(iv) On April 3, 2022, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TD's vehicle did not deploy and that TD's vehicle was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. In keeping

with the fact that TD was not seriously injured in the accident, TD did not visit any hospital emergency room following the accident. To the extent that TD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of TD on April 12, 2022, Body & Soul, Linares, and Silva billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(v) On August 15, 2022, an Insured named OH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in OH's vehicle did not deploy and that OH was not injured and did not complain of any pain at the scene. In keeping with the fact that OH was not seriously injured in the accident, OH did not visit any hospital emergency room following the accident. To the extent that OH experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of OH on August 18, 2022, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi) On September 3, 2022, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DR's vehicle did not deploy and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured in the accident, DR did not visit any hospital emergency room following the accident. To the extent that DR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of DR on September 7, 2022, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii) On October 6, 2022, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MA's vehicle did not deploy and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident.

To the extent that MA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MA on October 10, 2022, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(viii) On February 21, 2023, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JB's vehicle did not deploy and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and did not complain of any pain at the scene. In keeping with the fact that JB was not seriously injured in the accident, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JB on February 21, 2023, Body & Soul, Linares, and Silva billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(ix) On May 9, 2023, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AR's vehicle did not deploy and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured in the accident, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AR on May 16, 2023, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x) On August 17, 2023, an Insured named SR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SR's vehicle did not deploy and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and did not complain of any pain at the scene. In keeping with the fact that SR was not seriously injured in the accident, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of

the accident, they were of minimal severity. Even so, following a purported initial examination of SR on August 28, 2023, Body & Soul, Linares, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(xi) On January 30, 2024, an Insured named SR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SR's vehicle did not deploy and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and did not complain of any pain at the scene. In keeping with the fact that SR was not seriously injured in the accident, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SR on February 5, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii) On March 26, 2024, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YP's vehicle did not deploy and that YP's vehicle was drivable following the accident. The police report further indicated that YP was not injured and did not complain of any pain at the scene. In keeping with the fact that YP was not seriously injured in the accident, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of YP on April 8, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii) On August 1, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RG's vehicle did not deploy and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured in the accident, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported

initial examination of RG on August 6, 2024, Treat & Release, Orta, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(xiv) On September 9, 2024, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NC's vehicle did not deploy and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured in the accident, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of NC on September 11, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xv) On October 3, 2024, an Insured named IG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IG's vehicle did not deploy and that IG's vehicle was drivable following the accident. The police report further indicated that IG was not injured and did not complain of any pain at the scene. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of IG on October 7, 2024, Treat & Release, Orta, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(xvi) On November 6, 2024, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LF's vehicle did not deploy and that LF's vehicle was drivable following the accident. The police report further indicated that LF was not injured and did not complain of any pain at the scene. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LF on November 18, 2024, H&S Rehab,

Suarez, Humpierre, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

(xvii) On November 12, 2024, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EG's vehicle did not deploy and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured and did not complain of any pain at the scene. In keeping with the fact that EG was not seriously injured in the accident, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of EG on November 14, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xviii) On January 7, 2025, an Insured named YQ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YQ's vehicle did not deploy and that YQ's vehicle was drivable following the accident. The police report further indicated that YQ was not injured and did not complain of any pain at the scene. In keeping with the fact that YQ was not seriously injured in the accident, YQ did not visit any hospital emergency room following the accident. To the extent that YQ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of YQ on January 14, 2025, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xix) On March 8, 2025, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JG's vehicle did not deploy and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JG on March 17, 2025, MJ Rehab, Jimenez, and Tepper billed GEICO for the initial examination using CPT code 99203, and

thereby falsely represented that the initial examination involved presenting problems of low severity.

(xx) On March 24, 2025, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MG's vehicle did not deploy and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured in the accident, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MG on April 2, 2025, Treat & Release, Orta, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of low severity.

133. These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "5", the respective Defendants routinely falsely represented that the Insureds presented with problems of low severity or moderate severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of minimal severity or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii) Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

134. What is more, in the claims identified in Exhibits "1" - "5", the charges for the initial examinations under CPT codes 99203 and 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent

providing the examinations.

135. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes performing the examination.

136. Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

137. As set forth in Exhibits "1" - "5", the Defendants billed the purported initial examinations to GEICO through the respective Clinic Defendants under CPT codes 99203 and 99204, and thereby represented that the practitioners who purported to conduct the examinations spent at least 30-45 minutes performing the examinations.

138. In fact, in the initial examinations identified in Exhibits "1" - "5", the practitioners who purported to perform the initial examinations on behalf of the Clinic Defendants – usually Tepper, Machado, Robaina, Tordilla, or Silva – never spent more than 15 minutes when conducting the examinations, much less 30-45 minutes.

139. In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "5" did not take more than 15 minutes of time to perform, the examining practitioners used template forms in purporting to conduct the examinations.

140. All that was required to complete the template forms was a brief patient

interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

141. These interviews and examinations did not require Tepper, Machado, Robaina, Tordilla, Silva, or any other examining health care practitioner associated with the respective Clinic Defendants to spend more than 15 minutes performing the putative initial examinations.

142. In the claims for initial examinations that are identified in Exhibits "1" - "5", the respective Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

### (iii) Misrepresentations Regarding the Extent of the Medical Decision-Making During the Initial Examinations

143. Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

144. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the

patient's presenting problems, the diagnostic procedures, and/or the possible management options.

145. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

146. For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

147. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

148. For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would

be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

149. As set forth above and in Exhibits "1"- "5", most of the initial examinations that the Defendants billed through the respective Clinic Defendants to GEICO were billed under CPT codes 99203 and 99204, which represented that the examining health care practitioners engaged in some genuine, low complexity or moderate complexity medical decision-making during the initial examinations.

150. In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

151. Rather, in the claims for initial examinations identified in Exhibits "1" - "5": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the practitioners who purported to perform the examinations did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

152. For example:

(i) On January 7, 2021, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JE's vehicle did not deploy and that JE's vehicle was drivable following the accident. The police report further indicated that JE was not injured. In keeping with the fact that JE was not seriously injured in the accident, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as a result of the accident, they were of minimal severity. On January 11, 2021, Travis purported to conduct an initial examination of JE at H&S Rehab. Travis did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Travis provided JE with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither JE's presenting problems, nor the treatment plan provided to JE by Travis and H&S Rehab presented any risk of significant complications, morbidity, or mortality. To the contrary, JE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Travis and H&S Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JE if properly administered. Even so, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Travis engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii) On April 3, 2022, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in TD's vehicle did not deploy and that TD's vehicle was drivable following the accident. The police report further indicated that TD was not injured. In keeping with the fact that TD was not seriously injured in the accident, TD did not visit any hospital emergency room following the accident. To the extent that TD experienced any health problems at all as a result of the accident, they were of minimal severity. On April 12, 2022, Silva purported to conduct an initial examination of TD at Body & Soul. Silva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Silva provided TD with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither TD's presenting problems, nor the treatment plan provided to TD by Silva and Body & Soul presented any risk of significant complications, morbidity, or mortality. To the

contrary, TD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Silva and Body & Soul consisted of medically unnecessary physical therapy treatment, which did not pose any risk to TD if properly administered. Even so, Body & Soul, Linares, and Silva billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Silva engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii) On June 16, 2022, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GB's vehicle did not deploy and that GB was not injured. In keeping with the fact that GB was not seriously injured in the accident, GB did not visit any hospital emergency room following the accident. To the extent that GB experienced any health problems at all as a result of the accident, they were of minimal severity. On June 17, 2022, Tepper purported to conduct an initial examination of GB at Tampa Bay Services. Tepper did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tepper provided GB with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither GB's presenting problems, nor the treatment plan provided to GB by Tepper and Tampa Bay Services, presented any risk of significant complications, morbidity, or mortality. To the contrary, GB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tepper and Tampa Bay Services consisted of medically unnecessary physical therapy treatment, which did not pose any risk to GB if properly administered. Even so, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Tepper engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv) On August 27, 2022, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YS's vehicle did not deploy and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured. In keeping with the fact that YS was not seriously injured in the accident, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as a result of the accident, they were of minimal severity. On August 29, 2022, Silva purported to conduct an initial examination

of YS at Body & Soul. Silva did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Silva provided YS with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither YS's presenting problems, nor the treatment plan provided to YS by Silva and Body & Soul presented any risk of significant complications, morbidity, or mortality. To the contrary, YS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Silva and Body & Soul consisted of medically unnecessary physical therapy treatment, which did not pose any risk to YS if properly administered. Even so, Body & Soul, Linares, and Silva billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Silva engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v) On October 6, 2022, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MA's vehicle did not deploy and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured. In keeping with the fact that MA was not seriously injured in the accident, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of minimal severity. On October 10, 2022, Tordilla purported to conduct an initial examination of MA at H&S Rehab. Tordilla did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tordilla provided MA with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Tordilla and H&S Rehab presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tordilla and H&S Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MA if properly administered. Even so, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Tordilla engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi) On August 17, 2023, an Insured named SR was involved in an

automobile accident. The contemporaneous police report indicated that the airbags in SR's vehicle did not deploy and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured. In keeping with the fact that SR was not seriously injured in the accident, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of minimal severity. On August 28, 2023, Raymond purported to conduct an initial examination of SR at Body & Soul. Raymond did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Raymond provided SR with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither SR's presenting problems, nor the treatment plan provided to SR by Raymond and Body & Soul presented any risk of significant complications, morbidity, or mortality. To the contrary, SR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Raymond and Body & Soul consisted of medically unnecessary physical therapy treatment, which did not pose any risk to SR if properly administered. Even so, Body & Soul, Linares, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Raymond engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii) On October 27, 2023, an Insured named FG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in FG's vehicle did not deploy and that FG's vehicle was drivable following the accident. The police report further indicated that FG was not injured. In keeping with the fact that FG was not seriously injured in the accident, FG did not visit any hospital emergency room following the accident. To the extent that FG experienced any health problems at all as a result of the accident, they were of minimal severity. On October 31, 2023, Travis purported to conduct an initial examination of FG at Tampa Bay Services. Travis did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Travis provided FG with substantially the same list of false soft tissue injury "diagnoses" that she provided almost every other Insured. Furthermore, neither FG's presenting problems, nor the treatment plan provided to FG by Travis and Tampa Bay Services, presented any risk of significant complications, morbidity, or mortality. To the contrary, FG did not need any extensive treatment at all as a result of the accident, and the treatment

plan provided by Travis and Tampa Bay Services consisted of medically unnecessary physical therapy treatment, which did not pose any risk to FG if properly administered. Even so, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Travis engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii) On May 17, 2024, an Insured named NH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NH's vehicle did not deploy and that NH's vehicle was drivable following the accident. The police report further indicated that NH was not injured. In keeping with the fact that NH was not seriously injured in the accident, NH did not visit any hospital emergency room following the accident. To the extent that NH experienced any health problems at all as a result of the accident, they were of minimal severity. On May 20, 2024, Robaina purported to conduct an initial examination of NH at Treat & Release. Robaina did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Robaina provided NH with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither NH's presenting problems, nor the treatment plan provided to NH by Robaina and Treat & Release presented any risk of significant complications, morbidity, or mortality. To the contrary, NH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Robaina and Treat & Release consisted of medically unnecessary physical therapy treatment, which did not pose any risk to NH if properly administered. Even so, Treat & Release, Orta, and Robaina billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Robaina engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix) On August 12, 2024, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AG's vehicle did not deploy and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured. In keeping with the fact that AG was not seriously injured in the accident, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of minimal severity. On August 16, 2024, Machado purported to conduct an initial

examination of AG at Treat & Release. Machado did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Machado provided AG with substantially the same list of false soft tissue injury "diagnoses" that she provided almost every other Insured. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by Machado and Treat & Release presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Machado and Treat & Release consisted of medically unnecessary physical therapy treatment, which did not pose any risk to AG if properly administered. Even so, Treat & Release, Orta, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Machado engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x) On August 23, 2024, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JC's vehicle did not deploy and that JC was not injured. In keeping with the fact that JC was not seriously injured in the accident, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of minimal severity. On August 29, 2024, Machado purported to conduct an initial examination of JC at Treat & Release. Machado did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Machado provided JC with substantially the same list of false soft tissue injury "diagnoses" that she provided almost every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Machado and Treat & Release presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Machado and Treat & Release consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JC if properly administered. Even so, Treat & Release, Orta, and Raymond billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Machado engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi) On October 5, 2024, an Insured named GG was involved in an

automobile accident. The contemporaneous police report indicated that the airbags in GG's vehicle did not deploy and that GG was not injured and did not complain of any pain at the scene. In keeping with the fact that GG was not seriously injured in the accident, GG did not visit any hospital emergency room following the accident. To the extent that GG experienced any health problems at all as a result of the accident, they were of minimal severity. On October 14, 2024, Tepper purported to conduct an initial examination of GG at Tampa Bay Services. Tepper did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tepper provided GG with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither GG's presenting problems, nor the treatment plan provided to GG by Tepper and Tampa Bay Services, presented any risk of significant complications, morbidity, or mortality. To the contrary, GG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tepper and Tampa Bay Services consisted of medically unnecessary physical therapy treatment, which did not pose any risk to GG if properly administered. Even so, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Tepper engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii) On November 12, 2024, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EG's vehicle did not deploy and that EG's vehicle was drivable following the accident. The police report further indicated that EG was not injured. In keeping with the fact that EG was not seriously injured in the accident, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as a result of the accident, they were of minimal severity. On November 14, 2024, Tepper purported to conduct an initial examination of EG at Tampa Bay Services. Tepper did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tepper provided EG with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither EG's presenting problems, nor the treatment plan provided to EG by Tepper and Tampa Bay Services, presented any risk of significant complications, morbidity, or mortality. To the contrary, EG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tepper and Tampa Bay Services

consisted of medically unnecessary physical therapy treatment, which did not pose any risk to EG if properly administered. Even so, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Tepper engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii) On January 7, 2025, an Insured named YQ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YQ's vehicle did not deploy and that YQ's vehicle was drivable following the accident. The police report further indicated that YQ was not injured. In keeping with the fact that YQ was not seriously injured in the accident, YQ did not visit any hospital emergency room following the accident. To the extent that YQ experienced any health problems at all as a result of the accident, they were of minimal severity. On January 14, 2025, Tepper purported to conduct an initial examination of YQ at Tampa Bay Services. Tepper did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tepper provided YQ with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither YQ's presenting problems, nor the treatment plan provided to YQ by Tepper and Tampa Bay Services, presented any risk of significant complications, morbidity, or mortality. To the contrary, YQ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tepper and Tampa Bay Services consisted of medically unnecessary physical therapy treatment, which did not pose any risk to YQ if properly administered. Even so, Tampa Bay Services, Padron, and Tepper billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Tepper engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv) On March 8, 2025, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JG's vehicle did not deploy and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of minimal severity. On March 17, 2025, Wilson purported to conduct an initial examination of JG at MJ Rehab. Wilson did not retrieve, review, or analyze any significant

amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Wilson provided JG with substantially the same list of false soft tissue injury "diagnoses" that she provided almost every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Wilson and MJ Rehab presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Wilson and MJ Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JG if properly administered. Even so, MJ Rehab, Jimenez, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Wilson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv) On March 24, 2025, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MG's vehicle did not deploy and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured e. In keeping with the fact that MG was not seriously injured in the accident, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of minimal severity. On April 2, 2025, Tepper purported to conduct an initial examination of MG at Treat & Release. Tepper did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Tepper provided MG with substantially the same list of false soft tissue injury "diagnoses" that he provided almost every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Tepper and Treat & Release presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tepper and Treat & Release consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MG if properly administered. Even so, Treat & Release, Orta, and Tepper billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Tepper engaged in some legitimate, low complexity medical decision-making during the purported examination.

153. These are only representative examples. In the claims identified in

Exhibits "1" - "5", the respective Defendants routinely falsely represented that the purported examinations involved legitimate low complexity (when billed under CPT code 99203) or moderate complexity (when billed under CPT code 99204) medical decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

154. In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

155. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

156. Even so, in the claims identified in Exhibits "1" - "5", the Defendants routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

157. The Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever and had pre-determined outcomes.

158. There are a substantial number of variables that can affect whether, how,

and to what extent an individual is injured in a given automobile accident.

159. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

160. As set forth herein, in the claims identified in Exhibits "1" - "5", almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

161. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "3" and "5" would suffer substantially similar injuries as the result of their accidents or require a substantially similar course of treatment.

162. It is even more improbable that this kind of pattern would recur with great frequency within the cohort of patients treating at individual health care clinics such as Tampa Bay Services, Treat & Release, H&S Rehab, and Body & Soul, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

163. Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, in the claims identified in Exhibits "1'-"3" and "5", the respective Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds

to be issued substantially similar, false "diagnoses" and to be recommended substantially similar courses of medically unnecessary "treatment", despite the fact that they were differently situated.

164. For example:

(i) On February 18, 2021, two Insureds – KG and HR – were involved in the same automobile accident. Thereafter, both Insureds presented at H&S Rehab for initial examinations by Travis on the exact same date, February 23, 2021. At the conclusion of the purported initial examinations, Travis – at the direction of H&S Rehab, Suarez, Humpierre, and Tepper – provided KG and HR with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii) On August 16, 2021, two Insureds – KC and KD – were involved in the same automobile accident. Thereafter, both Insureds presented at Treat & Release for initial examinations by Alvarez on the exact same date, August 17, 2021. At the conclusion of the purported initial examinations, Alvarez – at the direction of Treat & Release, Orta, and Robaina – provided KC and KD with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii) On June 7, 2022, two Insureds – AN and CN – were involved in the same automobile accident. Thereafter, both Insureds presented at Body & Soul for initial examinations by Silva on the exact same date, June 9, 2022. At the conclusion of the purported initial examinations, Silva – at the direction of Body & Soul, Linares, and Silva – provided AN and CN with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv) On September 29, 2022, two Insureds – DC and DM – were involved in the same automobile accident. Thereafter, both Insureds presented at H&S Rehab for initial examinations by Tordilla on the exact same date, October 3, 2022. At the conclusion of the purported initial examinations, Tordilla – at the direction of H&S Rehab, Suarez, Humpierre, and Tepper – provided DC and DM with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v) On October 11, 2022, two Insureds – DC and IC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, October 13, 2022. At the conclusion of the purported initial examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided DC and IC with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi) On March 31, 2023, two Insureds – KL and SL – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, April 3, 2023. At the conclusion of the purported initial examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided KL and SL with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii) On July 24, 2023, two Insureds – MP and MS – were involved in the same automobile accident. Thereafter, both Insureds presented at H&S Rehab for initial examinations by Tordilla on the exact same date, July 31, 2023. At the conclusion of the purported initial examinations, Tordilla – at the direction of H&S Rehab, Suarez, Humpierre, and Tepper – provided MP and MS with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii) On January 8, 2024, two Insureds – RE and JS – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, January 10, 2024. At the conclusion of the purported initial examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided RE and JS with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix) On January 27, 2024, two Insureds – JC and FV – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, January 29, 2024. At the conclusion of the purported initial examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided JC and FV with substantially similar false soft

tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x) On March 27, 2024, two Insureds – LM and MF – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, April 10, 2024. At the conclusion of the purported initial examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided LM and MF with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xi) On April 2, 2024, two Insureds – DM and MM – were involved in the same automobile accident. Thereafter, both Insureds presented at Body & Soul for initial examinations by Raymond on the exact same date, April 3, 2024. At the conclusion of the purported initial examinations, Raymond – at the direction of Body & Soul, Linares, and Raymond – provided DM and MM with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xii) On November 1, 2024, two Insureds – EM and EG – were involved in the same automobile accident. Thereafter, both Insureds presented at Treat & Release for initial examinations by Machado on the exact same date, November 12, 2024. At the conclusion of the purported initial examinations, Machado – at the direction of Treat & Release, Orta, and Raymond – provided EM and EG with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiii) On November 5, 2024, two Insureds – YP and AR – were involved in the same automobile accident. Thereafter, both Insureds presented at Treat & Release for initial examinations by Machado on the exact same date, November 6, 2024. At the conclusion of the purported initial examinations, Machado – at the direction of Treat & Release, Orta, and Raymond – provided YP and AR with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv) On February 3, 2025, two Insureds – ED and JD – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Services for initial examinations by Tepper on the exact same date, February 4, 2025. At the conclusion of the purported initial

examinations, Tepper – at the direction of Tampa Bay Services, Padron, and Tepper – provided ED and JD with substantially similar false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv) On April 17, 2025, two Insureds – AM and LP – were involved in the same automobile accident. Thereafter, both Insureds presented at Treat & Release for initial examinations by Tepper on the exact same date, April 18, 2025. At the conclusion of the purported initial examinations, Tepper – at the direction of Treat & Release, Orta, and Tepper – provided AM and LP with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

165. These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" - "3" and "5", the treating practitioners – at the direction of Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, H&S Rehab, Suarez, Humpierre, Body & Soul, Linares, Silva, Fernandez, and Tepper – frequently issued substantially similar "diagnoses" to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

166. In the claims for initial examinations identified in Exhibits "1" - "5", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of low complexity or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

167. In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the other Fraudulent Services that the Defendants purported to provide.

168. In the claims for initial examinations identified in Exhibits "1" - "5", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iv) none of the Clinic Defendants was ever eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida Law.

### 2. The Fraudulent and Unlawful Charges for Follow-Up Examinations at the Clinic Defendants

169. In addition to their fraudulent initial examinations, the respective Defendants often purported to subject the Insureds in the claims identified in Exhibits "1"- "5" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

170. The purported follow-up examinations were then billed to GEICO in the following manner:

(i) in the claims identified in Exhibit "1", Tampa Bay Services, Padron, and Tepper typically billed GEICO under CPT codes 99211 and 99213 for the follow-up examinations that they purported to provide;

(ii) in the claims identified in Exhibit "2", Treat & Release, Orta, Robaina, Raymond, and Tepper typically billed GEICO under CPT codes 99211, 99213, and 99214 for the follow-up examinations that they purported to provide;

(iii) in the claims identified in Exhibit "3", H&S Rehab, Suarez, Humpierre, and Tepper typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(iv) in the claims identified in Exhibit "4", MJ Rehab, Jimenez, and Tepper typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide; and

(v) in the claims identified in Exhibit "5", Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper typically billed GEICO under CPT codes 99211 and 99213 for the follow-up examinations that they purported to provide.

171. As set forth herein, the charges for the follow-up examinations identified in Exhibits "1"-"5" misrepresented the nature, extent, and results of the purported follow-up examinations, and also falsely represented that Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul were operating in accordance with Florida law and were eligible to receive PIP reimbursement in the first place.

**(i) Misrepresentations Regarding the Severity of the Insureds' Presenting Problems During the Follow-Up Examinations**

172. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

173. The CPT Assistant provides various clinical examples of low to moderate

severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

(i) Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii) Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii) Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv) Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v) Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi) Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii) Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

174. Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient’s health.

175. Moreover, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

176. The CPT Assistant provides various clinical examples of moderate to

high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i) Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii) Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii) Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv) Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v) Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi) Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii) Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii) Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

177. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the

patient's health, or even the patient's life.

177. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1"- "5" suffered any injuries at all in their automobile accidents, the injuries were almost always minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

174. Minor soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1"- "5" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

175. Even so, in the claims for the follow-up examinations under CPT codes 99213 and 99214 identified in Exhibits "1"- "5", the respective Defendants falsely represented that the Insureds presented with problems of low to moderate (when billed under CPT code 99213) or moderate to high severity (when billed under CPT code 99214), when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

176. In the claims for follow-up examinations identified in Exhibits "1"- "5", the respective Defendants routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to: (i) create a false basis for their charges for follow-up examination under CPT codes 99213 and

99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii) Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations at the Clinic Defendants**

177. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that the examining practitioner engaged in medical decision making of "low complexity".

178. Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the examining practitioner engaged in medical decision-making of "moderate complexity".

179. Though the Defendants often billed for the purported follow-up examinations using CPT codes 99213 and 99214, neither Tepper, Machado, Robaina, Tordilla, Silva, nor any other practitioner associated with their respective Clinic Defendants in Exhibits "1"- "5", took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all in connection with the examinations.

180. Rather, in the claims identified in Exhibits "1"- "5", following the purported follow-up examinations, the examining practitioner simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) caused the Insureds to be referred for even more medically unnecessary physical

therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

181. The putative "follow-up examinations" that the Defendants purported to provide the Insureds in the claims identified in Exhibits "1"- "5" were, therefore, medically useless and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the respective Clinic Defendants.

182. In the claims for follow-up examinations identified in Exhibits "1"- "5", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii) none of the Clinics were ever eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida law.

183. In this context, Tepper, Robaina, Raymond, Silva, and Fernandez – who purported to serve as the "medical directors" of their respective Clinics – did not, and

could not have, conducted systematic reviews of clinic billings to ensure that the billings were not fraudulent or unlawful.

184. Had Tepper, Robaina, Raymond, Silva, and Fernandez actually fulfilled their statutory role as the medical directors at their respective Clinics, they would have noted – among other things – that the Defendants routinely fraudulently represented in the Clinics' billing that the putative examinations were legitimately and lawfully performed, and would have taken corrective action.

**(iii) The Fraudulent Charges for Illusory Follow-Up Examinations at Tampa Bay Services and Treat & Release**

185. As discussed herein, the Clinic Defendants purported to provide almost every Insured with a course of in-office physical therapy treatment.

186. The Defendants then billed the physical therapy services to GEICO using a variety of CPT codes.

187. At the same time, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211, contemporaneously with their supposed provision of physical therapy treatment, typically seeking $40.00 at Tampa Bay Services and $45.00 at Treat & Release for each such putative follow-up examination.

188. However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

189. Instead, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper billed GEICO for illusory follow-up examinations under CPT

code 99211 in order to maximize the fraudulent and unlawful billing they could submit to GEICO.

190. In keeping with the fact that the follow-up examinations billed under CPT code 99211 contemporaneously with the physical therapy services were illusory, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper almost never submitted any report, notes, or any substantiating documentation in connection with the purported follow-up examinations billed under CPT code 99211.

191. Even so, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper routinely submitted charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

### 3. The Fraudulent and Unlawful Charges for Physical Therapy at the Clinic Defendants

192. In addition to the fraudulent initial examinations, and follow-up examinations, the respective Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1"- "5", to weeks of medically unnecessary physical therapy.

193. Specifically, the Defendants caused almost every Insured to receive at least three to four weeks of purported physical therapy treatments, typically several times per week.

194. In addition, the Defendants caused almost every Insured to receive substantially similar types of physical therapy services, including: (i) hot/cold packs;

(ii) electrical stimulation; (iii) ultrasound therapy; (iv) manual therapy; and (v) therapeutic activities.

195. In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they received the physical therapy.

196. By contrast, at the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols.

197. In addition, in the claims for physical therapy services identified in Exhibits "1"-"5", the Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by licensed health care practitioners other than massage therapists, when in fact they were unlawfully performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals associated with the Defendants, who are not and never have been licensed as physical therapists.

198. In the claims for physical therapy services identified in Exhibits "1"- "5", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii) the services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals;

(iii) the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv) the Defendants were never eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they unlawfully operated in violation of Florida law.

**4. The Fraudulent and Unlawful Charges for Extracorporeal Shockwave Therapy at Tampa Bay Services and H&S Rehab**

199. Based upon the false, boilerplate "diagnoses" that Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, Tordilla, and Tepper provided during the initial and follow-up examinations, Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, Tordilla, and Tepper also purported to subject many of the Insureds in the claims identified in Exhibits "1" and "3" to one or more sessions of extracorporeal shockwave therapy ("ESWT") during the course of their fraudulent treatment protocol.

200. Typically, Tepper purported to perform the ESWT at Tampa Bay Services, which then was billed to GEICO through Tampa Bay Services under CPT code 0101T, almost always resulting in a charge of $600.00 for each ESWT treatment that supposedly was provided.

201. Typically, Tordilla purported to perform the ESWT at H&S Rehab, which then was billed to GEICO through H&S Rehab under CPT code 0101T, almost always resulting in a charge of $803.60 for each ESWT treatment that supposedly was

provided.

202. Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, Tordilla, and Tepper provided during their fraudulent examinations.

203. In keeping with the fact that Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, Tordilla, and Tepper's ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for CMS, has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

204. Even so, Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, Tordilla, and Tepper purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

205. For example:

(i) On or about August 12, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through Tampa Bay Services to an Insured named MH.

(ii) On or about September 9, 2024, Tampa Bay Services, Padron, and

Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through Tampa Bay Services to an Insured named FP.

(iii) On or about October 1, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through Tampa Bay Services to an Insured named AT.

(iv) On or about December 20, 2024, Tampa Bay Services, Padron, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through Tampa Bay Services to an Insured named LL.

(v) On or about January 2, 2025, Tampa Bay Services, Padron, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through Tampa Bay Services to an Insured named NG.

(vi) On or about January 16, 2025, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through H&S Rehab to an Insured named LF.

(vii) On or about March 13, 2025, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through H&S Rehab to an Insured named RS.

(viii) On or about March 18, 2025, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through H&S Rehab to an Insured named SH.

(ix) On or about May 6, 2025, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through H&S Rehab to an Insured named IM.

(x) On or about June 5, 2025, H&S Rehab, Suarez, Humpierre, and Tepper billed GEICO for medically unnecessary ESWT that was purportedly provided through H&S Rehab to an Insured named IG.

206. These are only representative examples. In the claims for ESWT identified in Exhibits “1” and “3”, Tampa Bay Services, Padron, H&S Rehab, Suarez, Humpierre, and Tepper routinely billed GEICO for medically unnecessary ESWT that

was purportedly provided through Tampa Bay Services and H&S Rehab to Insureds.

### 5. The Fraudulent Charges for HME at Tampa Bay Services and Treat & Release

207. As part of their fraudulent scheme, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper purported to provide many Insureds with HME.

208. In particular, and as set forth in Exhibits "1" and "2", Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper prescribed many Insureds with HME – namely, rigid lumbar-sacral orthotics ("LSO") – that were purportedly provided and billed through Tampa Bay Services and Treat & Release.

209. As set forth in Exhibit "1", Tampa Bay Servies, Padron, and Tepper billed GEICO for the rigid LSOs under HCPCS code L0637, typically resulting in a charge of $2,628.00 for each putative unit.

210. As set forth in Exhibit "2", Treat & Release, Orta, Robaina, Raymond, and Tepper billed GEICO for the rigid LSOs under HCPCS codes L0631 and L0637, typically resulting in a charge of $1,214.45 and $2,717.98, respectively, for each putative unit.

211. Like Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper's charges for the other Fraudulent Services, the charges for the LSOs were fraudulent in that they misrepresented Tampa Bay Services and Treat & Release's eligibility to collect PIP Benefits in the first instance.

212. In fact, and as set forth herein, Tampa Bay Services and Treat & Release were never eligible to collect PIP Benefits, inasmuch as they were operated in violation of the Florida law and the HME licensing laws.

213. Moreover, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper's charges for the rigid LSOs identified in Exhibits "1" and "2" also were fraudulent in that they misrepresented the medical necessity of the rigid LSOs.

214. HCPCS codes L0631 and L0637 describe lumbar-sacral orthoses ("LSO") that are rigid, custom-fitted, lower-back braces designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, a rigid LSO is customized by an individual with expertise to fit the specific patient in order for it to be properly utilized by the patient.

215. In a legitimate clinical setting, a rigid LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

216. Because the rigid LSO is designed to limit a patient's lumbar spine range of motion, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

217. Along similar lines, the prescription and use of a rigid LSO is counterproductive to the goals of physical therapy and chiropractic treatment modalities, which seek to restore movement and functionality to the lumbar spine.

218. In fact, the medically unnecessary prescription of a rigid LSO – and resulting immobilization of the lumbar spine – may put the patient at considerable risk of weakening muscles or even muscle atrophy of muscles in the lower back.

219. Almost none of the Insureds in the claims identified in Exhibits "1" and "2" suffered from spinal instability. In fact, almost none of the Insureds in the claims identified in Exhibits "1" and "2" suffered any serious injuries at all, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

220. Even so, following their fraudulent initial examinations, boilerplate examination reports, and duplicative and medically impossible diagnoses, Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper purported to provide many Insureds with a medically unwarranted rigid LSO, despite that fact that:

(i) almost none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

(ii) neither Tepper, Robaina, Raymond, nor any other individual associated with Tampa Bay Services or Treat & Release, legitimately measured or fitted the device for the Insureds; and

(iii) the Insureds were concomitantly referred for physical therapy and chiropractic treatment at Sunrise Injury, the putative purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spine.

221. For example:

(i) On January 30, 2024, an Insured named SR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SR's vehicle did not deploy and that SR's vehicle was drivable following the accident. The police report further indicated that SR did not complain of any pain at the scene of the accident. In keeping

with the fact that SR was not seriously injured in the accident, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on February 5, 2024, SR presented to Tampa Bay Services for an initial examination by Tepper. Thereafter, on February 5, 2024, the same day as SR's initial examination, Tepper and Tampa Bay Services prescribed SR with a medically unnecessary rigid LSO, despite the fact that SR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Tampa Bay Services, the putative purpose of which was to increase, rather than decrease, SR's range of motion. Tepper and Tampa Bay Services then submitted a bill to GEICO under HCPCS code L0637, seeking reimbursement of $2,628.00 for the medically unnecessary rigid LSO.

(ii) On March 26, 2024, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YP's vehicle did not deploy and that YP's vehicle was drivable following the accident. The police report further indicated that YP did not complain of any pain at the scene of the accident. In keeping with the fact that YP was not seriously injured in the accident, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on April 8, 2024, YP presented to Tampa Bay Services for an initial examination by Tepper. Thereafter, on April 8, 2024, the same day as YP's initial examination, Tepper and Tampa Bay Services prescribed YP with a medically unnecessary rigid LSO, despite the fact that YP: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Tampa Bay Services, the putative purpose of which was to increase, rather than decrease, YP's range of motion. Tepper and Tampa Bay Services then submitted a bill to GEICO under HCPCS code L0637, seeking reimbursement of $2,628.00 for the medically unnecessary rigid LSO.

(iii) On March 29, 2024, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AR's vehicle did not deploy and that AR's vehicle was drivable following the accident. The police report further indicated that

AR's vehicle was drivable following the accident. The police report further indicated that AR did not complain of any pain at the scene of the accident. In keeping with the fact that AR was not seriously injured in the accident, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on March 29, 2024, AR presented to Treat & Release for an initial examination by Machado. Thereafter, on March 29, 2024, the same day as AR's initial examination, Machado and Treat & Release prescribed AR with a medically unnecessary rigid LSO, despite the fact that AR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Machado for physical therapy and chiropractic treatment at Treat & Release, the putative purpose of which was to increase, rather than decrease, AR's range of motion. Raymond and Treat & Release then submitted a bill to GEICO under HCPCS code L0631, seeking reimbursement of $1,214.45 for the medically unnecessary rigid LSO.

(iv) On August 12, 2024, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AG's vehicle did not deploy and that AG's vehicle was drivable following the accident. The police report further indicated that AG's vehicle was drivable following the accident. The police report further indicated that AG did not complain of any pain at the scene of the accident. In keeping with the fact that AG was not seriously injured in the accident, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on August 16, 2024, AG presented to Treat & Release for an initial examination by Machado. Thereafter, on August 16, 2024, the same day as AG's initial examination, Machado and Treat & Release prescribed AG with a medically unnecessary rigid LSO, despite the fact that AG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Machado for physical therapy and chiropractic treatment at Treat & Release, the putative purpose of which was to increase, rather than decrease, AG's range of motion. Raymond and Treat & Release then submitted a bill to GEICO under HCPCS code L0631, seeking reimbursement of $1,214.45 for the medically unnecessary rigid LSO.

(v) On August 30, 2024, an Insured named BC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BC's vehicle did not deploy and that BC's vehicle was drivable following the accident. The police report further indicated that BC did not complain of any pain at the scene of the accident. In keeping with the fact that BC was not seriously injured in the accident, BC did not visit any hospital emergency room following the accident. To the extent that BC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on September 5, 2024, BC presented to Treat & Release for an initial examination by Machado. Thereafter, on September 5, 2024, the same day as BC's initial examination, Machado and Treat & Release prescribed BC with a medically unnecessary rigid LSO, despite the fact that BC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Machado for physical therapy and chiropractic treatment at Treat & Release, the putative purpose of which was to increase, rather than decrease, BC's range of motion. Raymond and Treat & Release then submitted a bill to GEICO under HCPCS code L0631, seeking reimbursement of $1,214.45 for the medically unnecessary rigid LSO.

(vi) On September 9, 2024, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NC's vehicle did not deploy and that NC's vehicle was drivable following the accident. The police report further indicated that NC did not complain of any pain at the scene of the accident. In keeping with the fact that NC was not seriously injured in the accident, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on September 11, 2024, NC presented to Tampa Bay Services for an initial examination by Tepper. Thereafter, on September 11, 2024, the same day as NC's initial examination, Tepper and Tampa Bay Services prescribed NC with a medically unnecessary rigid LSO, despite the fact that NC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Tampa Bay Services, the putative purpose of which was to increase, rather than decrease, NC's range of motion. Tepper and Tampa Bay Services then submitted a bill to GEICO under HCPCS code L0637, seeking reimbursement of $2,628.00 for the medically unnecessary rigid LSO.

(vii) On October 3, 2024, an Insured named IG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IG's vehicle did not deploy and that IG's vehicle was drivable following the accident. The police report further indicated that IG did not complain of any pain at the scene of the accident. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on October 7, 2024, IG presented to Treat & Release for an initial examination by Machado. Thereafter, on October 7, 2024, the same day as IG's initial examination, Machado and Treat & Release prescribed IG with a medically unnecessary rigid LSO, despite the fact that IG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Machado for physical therapy and chiropractic treatment at Treat & Release, the putative purpose of which was to increase, rather than decrease, IG's range of motion. Raymond and Treat & Release then submitted a bill to GEICO under HCPCS code L0631, seeking reimbursement of $1,214.45 for the medically unnecessary rigid LSO.

(viii) On October 5, 2024, an Insured named GG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GG's vehicle did not deploy and that GG did not complain of any pain at the scene of the accident. In keeping with the fact that GG was not seriously injured in the accident, EG did not visit any hospital emergency room following the accident. To the extent that GG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on October 14, 2024, GG presented to Tampa Bay Services for an initial examination by Tepper. Thereafter, on October 14, 2024, the same day as GG's initial examination, Tepper and Tampa Bay Services prescribed GG with a medically unnecessary rigid LSO, despite the fact that GG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Tampa Bay Services, the putative purpose of which was to increase, rather than decrease, GG's range of motion. Tepper and Tampa Bay Services then submitted a bill to GEICO under HCPCS code L0637, seeking reimbursement of $2,628.00 for the medically unnecessary rigid LSO.

(ix) On November 12, 2024, an Insured named EG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EG's vehicle did not deploy and that EG's vehicle was drivable following the accident. The police report further indicated that EG did not complain of any pain at the scene of the accident. In keeping with the fact that EG was not seriously injured in the accident, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on November 14, 2024, EG presented to Tampa Bay Services for an initial examination by Tepper. Thereafter, on November 14, 2024, the same day as EG's initial examination, Tepper and Tampa Bay Services prescribed EG with a medically unnecessary rigid LSO, despite the fact that EG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Tampa Bay Services, the putative purpose of which was to increase, rather than decrease, EG's range of motion. Tepper and Tampa Bay Services then submitted a bill to GEICO under HCPCS code L0637, seeking reimbursement of $2,628.00 for the medically unnecessary rigid LSO.

(x) On March 24, 2025, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MG's vehicle did not deploy and that MG's vehicle was drivable following the accident. The police report further indicated that MG did not complain of any pain at the scene of the accident. In keeping with the fact that MG was not seriously injured in the accident, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Then, on April 2, 2025, MG presented to Treat & Release for an initial examination by Tepper. Thereafter, on April 2, 2025, the same day as MG's initial examination, Tepper and Treat & Release prescribed MG with a medically unnecessary rigid LSO, despite the fact that MG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) in fact, was concomitantly referred by Tepper for physical therapy and chiropractic treatment at Treat & Release, the putative purpose of which was to increase, rather than decrease, MG's range of motion. Tepper and Treat & Release then submitted a bill to GEICO under HCPCS code L0631, seeking reimbursement of $1,214.45 for the medically unnecessary rigid LSO.

222. These are only representative examples. In almost all of the claims for rigid LSOs identified in Exhibits "1" and "2", Tampa Bay Services, Padron, Treat & Release, Orta, Robaina, Raymond, and Tepper falsely represented that the prescribed rigid LSOs were medically necessary, when in fact they were not.

## III. The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

223. To support their fraudulent charges, the Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul, respectively – containing thousands of individual charges – seeking payment for the Fraudulent Services that the Defendants were not entitled to receive.

224. The claims that the Defendants submitted to GEICO were false and misleading in the following, material respects:

(i) The HCFA-1500 forms and treatment reports by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii) The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii) The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

225. The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

226. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

227. For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

228. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and frequently were never performed in the first instance.

229. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals and unlawfully billed to GEICO.

230. The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the

charges were not promptly paid in full.

231. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $5,900,000.00.

232. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

233. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

234. There is an actual case and controversy between GEICO and Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

235. Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO

because Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul were unlawfully operated in violation of Florida law.

236. Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO.

237. Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

238. Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

239. Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

240. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Padron**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

241. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

242. Tampa Bay Services is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

243. Padron was employed by – or associated with – the Tampa Bay Services enterprise.

244. Padron knowingly conducted and/or participated in, directly or indirectly, the conduct of Tampa Bay Services' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Tampa Bay Services was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Services was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

245. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1".

246. Tampa Bay Services' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Padron operated Tampa Bay Services, inasmuch as Tampa Bay Services was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Tampa Bay Services to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Tampa Bay Services and Padron continue to attempt collection on the fraudulent billing submitted through Tampa Bay Services to the present day.

247. Tampa Bay Services is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tampa Bay

Services in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

248. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,632,000.00 pursuant to the fraudulent bills submitted through the Tampa Bay Services enterprise.

249. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION
## Against Padron and Tepper
## (Violation of RICO, 18 U.S.C. § 1962(d))

250. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

251. Tampa Bay Services is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

252. Padron and Tepper were employed by – or associated with – the Tampa Bay Services enterprise.

253. Padron and Tepper knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Tampa Bay Services' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Tampa Bay Services was not eligible to

receive under the No-Fault Law because: (i) Tampa Bay Services was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

254. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

255. Padron and Tepper knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

256. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,632,000.00 pursuant to the

fraudulent bills submitted through the Tampa Bay Services enterprise.

257. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against Tampa Bay Services, Padron, and Tepper**
**(Under Fla. Stat. §§ 501.201 et seq.)**

258. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

259. Tampa Bay Services, Padron, and Tepper were actively engaged in trade and commerce in the State of Florida.

260. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

261. Tampa Bay Services, Padron, and Tepper engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

262. The bills and supporting documents submitted to GEICO by Tampa Bay Services, Padron, and Tepper were fraudulent in that they misrepresented: (i) Tampa Bay Services' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

263. Such acts and practices offend public policy and are immoral, unethical,

oppressive, and unscrupulous. Additionally, the conduct of Tampa Bay Services, Padron, and Tepper has been materially injurious to GEICO and its Insureds.

264. The conduct of Tampa Bay Services, Padron, and Tepper was the actual and proximate cause of the damages sustained by GEICO.

265. Tampa Bay Services, Padron, and Tepper's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,632,000.00.

266. By reason of Tampa Bay Services, Padron, and Tepper's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Tampa Bay Services, Padron, and Tepper**
**(Common Law Fraud)**

267. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

268. Tampa Bay Services, Padron, and Tepper intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting thousands of fraudulent charges through Tampa Bay Services for the Fraudulent Services.

269. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Tampa Bay Services was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when,

in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

270. Tampa Bay Services, Padron, and Tepper intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tampa Bay Services that were not reimbursable.

271. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,632,000.00 pursuant to the fraudulent bills that were submitted by Tampa Bay Services, Padron, and Tepper through Tampa Bay Services.

272. Tampa Bay Services, Padron, and Tepper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

273. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTH CAUSE OF ACTION**
**Against Tampa Bay Services, Padron, and Tepper**
**(Unjust Enrichment)**

274. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

275. As set forth above, Tampa Bay Services, Padron, and Tepper have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

276. When GEICO paid the bills and charges submitted by Tampa Bay Services, Padron, and Tepper through Tampa Bay Services, it reasonably believed that it was legally obligated to make such payments based on Tampa Bay Services, Padron, and Tepper's improper, unlawful, and/or unjust acts.

277. Tampa Bay Services, Padron, and Tepper have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Tampa Bay Services, Padron, and Tepper voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

278. Tampa Bay Services, Padron, and Tepper's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

279. By reason of the above, Tampa Bay Services, Padron, and Tepper have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,632,000.00.

## SEVENTH CAUSE OF ACTION
**Against Orta**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

280. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

281. Treat & Release is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

282. Orta has knowingly conducted and/or participated in, directly or indirectly, the conduct of Treat & Release's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Treat & Release was not eligible to receive under the No-Fault Law because: (i) Treat & Release was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

283. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2".

284. Treat & Release's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Soriano operated Treat & Release, inasmuch as Treat & Release was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Treat & Release to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Treat & Release and Orta continue to attempt collection on the fraudulent billing submitted through Treat & Release to the present day.

285. Treat & Release is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Treat & Release in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

286. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,270,000.00 pursuant to the fraudulent bills submitted through the Treat & Release enterprise.

287. By reason of its injury, GEICO is entitled to treble damages, costs, and

reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTH CAUSE OF ACTION**
**Against Orta, Robaina, Raymond, and Tepper**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

288. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

289. Treat & Release is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

290. Orta, Robaina, Raymond, and Tepper were employed by – or associated with – the Treat & Release enterprise.

291. Orta, Robaina, Raymond, and Tepper knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Treat & Release's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Treat & Release was not eligible to receive under the No-Fault Law because: (i) Treat & Release was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide

medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

292. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

293. Orta, Robaina, Raymond, and Tepper knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

294. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,270,000.00 pursuant to the fraudulent bills submitted through the Treat & Release enterprise.

295. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**NINTH CAUSE OF ACTION**
**Against Treat & Release, Orta, Robaina, Raymond, and Tepper**
**(Under Fla. Stat. §§ 501.201 et seq.)**

296. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

297. Treat & Release, Orta, Robaina, Raymond, and Tepper were actively engaged in trade and commerce in the State of Florida.

298. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

299. Treat & Release, Orta, Robaina, Raymond, and Tepper engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

300. The bills and supporting documents submitted to GEICO by Treat & Release, Orta, Robaina, Raymond, and Tepper were fraudulent in that they misrepresented: (i) Treat & Release's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

301. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Treat & Release, Orta, Robaina, Raymond, and Tepper has been materially injurious to GEICO and its Insureds.

302. The conduct of Treat & Release, Orta, Robaina, Raymond, and Tepper was the actual and proximate cause of the damages sustained by GEICO.

303. Treat & Release, Orta, Robaina, Raymond, and Tepper's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,270,000.00.

304. By reason of Treat & Release, Orta, Robaina, Raymond, and Tepper's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TENTH CAUSE OF ACTION
**Against Treat & Release, Orta, Robaina, Raymond, and Tepper**
**(Common Law Fraud)**

305. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

306. Treat & Release, Orta, Robaina, Raymond, and Tepper intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting thousands of fraudulent charges through Treat & Release for the Fraudulent Services.

307. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Treat & Release was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services

were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

308. Treat & Release, Orta, Robaina, Raymond, and Tepper intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Treat & Release that were not reimbursable.

309. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,270,000.00 pursuant to the fraudulent bills that were submitted by Treat & Release, Orta, Robaina, Raymond, and Tepper through Treat & Release.

310. Treat & Release, Orta, Robaina, Raymond, and Tepper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

311. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## ELEVENTH CAUSE OF ACTION
**Against Treat & Release, Orta, Robaina, Raymond, and Tepper**
**(Unjust Enrichment)**

312. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

313. As set forth above, Treat & Release, Orta, Robaina, Raymond, and Tepper have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

314. When GEICO paid the bills and charges submitted by Treat & Release, Orta, Robaina, Raymond, and Tepper through Treat & Release, it reasonably believed that it was legally obligated to make such payments based on Treat & Release, Orta, Robaina, Raymond, and Tepper's improper, unlawful, and/or unjust acts.

315. Treat & Release, Orta, Robaina, Raymond, and Tepper have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Treat & Release, Orta, Robaina, Raymond, and Tepper voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

316. Treat & Release, Orta, Robaina, Raymond, and Tepper's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

317. By reason of the above, Treat & Release, Orta, Robaina, Raymond, and Tepper have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,270,000.00.

**<u>TWELFTH CAUSE OF ACTION</u>**
**Against Suarez and Humpierre**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

318. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

319. H&S Rehab is an ongoing "enterprise", as that term is defined in 18

U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

320. Suarez and Humpierre knowingly conducted and/or participated in, directly or indirectly, the conduct of H&S Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that H&S Rehab was not eligible to receive under the No-Fault Law because: (i) H&S Rehab was unlawfully operated in violation Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

321. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3".

322. H&S Rehab's business is racketeering activity, inasmuch as the enterprise

exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Suarez and Humpierre operated H&S Rehab, inasmuch as H&S Rehab was not engaged in a legitimate health care practice and acts of mail fraud were, therefore, essential in order for H&S Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that H&S Rehab, Suarez, and Humpierre continue to attempt collection on the fraudulent billing submitted through H&S Rehab to the present day.

323. H&S Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by H&S Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

324. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,002,000.00 pursuant to the fraudulent bills submitted through H&S Rehab.

325. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## <u>THIRTEENTH CAUSE OF ACTION</u>
### Against Suarez, Humpierre, and Tepper
### (Violation of RICO, 18 U.S.C. § 1962(d))

326. GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-232, above.

327. H&S Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

328. Suarez, Humpierre, and Tepper were employed by – or associated with – the H&S Rehab enterprise.

329. Suarez, Humpierre, and Tepper knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of H&S Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that H&S Rehab was not eligible to receive under the No-Fault Law because: (i) H&S Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

330. A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

331. Suarez, Humpierre, and Tepper knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

332. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,002,000.00 pursuant to the fraudulent bills submitted through the H&S Rehab enterprise.

333. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTEENTH CAUSE OF ACTION**
**Against H&S Rehab, Suarez, Humpierre, and Tepper**
**(Under Fla. Stat. §§ 501.201 et seq.)**

334. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

335. H&S Rehab, Suarez, Humpierre, and Tepper were actively engaged in trade and commerce in the State of Florida.

336. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

337. H&S Rehab, Suarez, Humpierre, and Tepper engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

338. The bills and supporting documents submitted to GEICO by H&S Rehab, Suarez, Humpierre, and Tepper were fraudulent in that they misrepresented: (i) H&S Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

339. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of H&S Rehab, Suarez, Humpierre, and Tepper has been materially injurious to GEICO and its Insureds.

340. The conduct of H&S Rehab, Suarez, Humpierre, and Tepper was the actual and proximate cause of the damages sustained by GEICO.

341. H&S Rehab, Suarez, Humpierre, and Tepper's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,002,000.00.

342. By reason of H&S Rehab, Suarez, Humpierre, and Tepper's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTEENTH CAUSE OF ACTION**
**Against H&S Rehab, Suarez, Humpierre, and Tepper**
**(Common Law Fraud)**

343. GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-232, above.

344. H&S Rehab, Suarez, Humpierre, and Tepper intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting thousands of fraudulent charges through H&S Rehab for the Fraudulent Services.

345. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that H&S Rehab was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

346. H&S Rehab, Suarez, Humpierre, and Tepper intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through H&S Rehab that were not reimbursable.

347. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $1,002,000.00 pursuant to the fraudulent bills that were submitted by H&S Rehab, Suarez, Humpierre, and Tepper through H&S Rehab.

348. H&S Rehab, Suarez, Humpierre, and Tepper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

349. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTEENTH CAUSE OF ACTION
**Against H&S Rehab, Suarez, Humpierre, and Tepper**
**(Unjust Enrichment)**

350. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

351. As set forth above, H&S Rehab, Suarez, Humpierre, and Tepper have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

352. When GEICO paid the bills and charges submitted by H&S Rehab, Suarez, Humpierre, and Tepper through H&S Rehab, it reasonably believed that it was legally obligated to make such payments based on H&S Rehab, Suarez, Humpierre, and Tepper's improper, unlawful, and/or unjust acts.

353. H&S Rehab, Suarez, Humpierre, and Tepper have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that H&S Rehab, Suarez, Humpierre, and Tepper voluntarily accepted notwithstanding their

improper, unlawful, and unjust billing scheme.

354. H&S Rehab, Suarez, Humpierre, and Tepper's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

355. By reason of the above, H&S Rehab, Suarez, Humpierre, and Tepper have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,002,000.00.

## SEVENTEENTH CAUSE OF ACTION
**Against Jimenez**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

356. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

357. MJ Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

358. Jimenez has knowingly conducted and/or participated in, directly or indirectly, the conduct of MJ Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over one year seeking payments that MJ Rehab was not eligible to receive under the No-Fault Law because: (i) MJ Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to

financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

359. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit “4”.

360. MJ Rehab’s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jimenez operated MJ Rehab, inasmuch as MJ Rehab was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for MJ Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that MJ Rehab and Jimenez continue to attempt collection on the fraudulent billing submitted through MJ Rehab the present day.

361. MJ Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by MJ Rehab in pursuit

of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

362. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills submitted through the MJ Rehab enterprise.

363. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTEENTH CAUSE OF ACTION**
**Against MJ Rehab, Jimenez, and Tepper**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

364. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

365. MJ Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

366. MJ Rehab, Jimenez, and Tepper were employed by – or associated with – the MJ Rehab enterprise.

367. MJ Rehab, Jimenez, and Tepper knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of MJ Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over one year seeking payments that MJ Rehab was not eligible to receive

under the No-Fault Law because: (i) MJ Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

368. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

369. MJ Rehab, Jimenez, and Tepper knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

370. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills submitted through the MJ Rehab enterprise.

371. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**NINETEENTH CAUSE OF ACTION**
**Against MJ Rehab, Jimenez, and Tepper**
**(Under Fla. Stat. §§ 501.201 et seq.)**

372. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

373. MJ Rehab, Jimenez, and Tepper are actively engaged in trade and commerce in the State of Florida.

374. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

375. MJ Rehab, Jimenez, and Tepper engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

376. The bills and supporting documents submitted to GEICO by MJ Rehab, Jimenez, and Tepper were fraudulent in that they misrepresented: (i) MJ Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

377. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of MJ Rehab, Jimenez, and

Tepper has been materially injurious to GEICO and its Insureds.

378. The conduct of MJ Rehab, Jimenez, and Tepper was the actual and proximate cause of the damages sustained by GEICO.

379. MJ Rehab, Jimenez, and Tepper's unfair and deceptive acts have caused GEICO to sustain damages of at least $151,000.00.

380. By reason of MJ Rehab, Jimenez, and Tepper's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TWENTIETH CAUSE OF ACTION
**Against MJ Rehab, Jimenez, and Tepper**
**(Common Law Fraud)**

381. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

382. MJ Rehab, Jimenez, and Tepper intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting thousands of fraudulent charges through MJ Rehab for the Fraudulent Services.

383. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MJ Rehab was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP

reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

384. MJ Rehab, Jimenez, and Tepper intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MJ Rehab that were not reimbursable.

385. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills that were submitted by MJ Rehab, Jimenez, and Tepper through MJ Rehab.

386. MJ Rehab, Jimenez, and Tepper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

387. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FIRST CAUSE OF ACTION**
**Against MJ Rehab, Jimenez, and Tepper**
**(Unjust Enrichment)**

388. GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-232, above.

389. As set forth above, MJ Rehab, Jimenez, and Tepper have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

390. When GEICO paid the bills and charges submitted by MJ Rehab, Jimenez, and Tepper through MJ Rehab, it reasonably believed that it was legally obligated to make such payments based on MJ Rehab, Jimenez, and Tepper's improper, unlawful, and/or unjust acts.

391. MJ Rehab, Jimenez, and Tepper have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that MJ Rehab, Jimenez, and Tepper voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

392. MJ Rehab, Jimenez, and Tepper's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

393. By reason of the above, MJ Rehab, Jimenez, and Tepper have been unjustly enriched in an amount to be determined at trial, but in no event less than $151,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Linares
### (Violation of RICO, 18 U.S.C. § 1962(c))

394. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

395. Body & Soul is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

396. Linares knowingly conducted and/or participated in, directly or indirectly, the conduct of Body & Soul's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Body & Soul was not eligible to receive under the No-Fault Law because: (i) Body & Soul was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

397. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "5".

398. Body & Soul's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The

predicate acts of mail fraud are the regular way in which Linares operated Body & Soul, inasmuch as Body & Soul was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Body & Soul to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Body & Soul and Linares continue to attempt collection on the fraudulent billing submitted through Body & Soul to the present day.

399. Body & Soul is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Body & Soul in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

400. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $877,000.00 pursuant to the fraudulent bills submitted through the Body & Soul enterprise.

401. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-THIRD CAUSE OF ACTION
**Against Linares, Silva, Raymond, Fernandez, and Tepper**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

402. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

403. Body & Soul is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

404. Linares, Silva, Raymond, Fernandez, and Tepper were employed by – or associated with – the Body & Soul enterprise.

405. Linares, Silva, Raymond, Fernandez, and Tepper knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Body & Soul's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Body & Soul was not eligible to receive under the No-Fault Law because: (i) Body & Soul was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

406. A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

407. Linares, Silva, Raymond, Fernandez, and Tepper knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

408. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $877,000.00 pursuant to the fraudulent bills submitted through the Body & Soul enterprise.

409. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper**
**(Under Fla. Stat. §§ 501.201 et seq.)**

410. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

411. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper are actively engaged in trade and commerce in the State of Florida.

412. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

413. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

414. The bills and supporting documents submitted to GEICO by Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper were fraudulent in that they misrepresented: (i) Body & Soul's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were legitimately performed in the first instance.

415. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper has been materially injurious to GEICO and its Insureds.

416. The conduct of Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper was the actual and proximate cause of the damages sustained by GEICO.

417. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper's unfair and deceptive acts have caused GEICO to sustain damages of at least $877,000.00.

418. By reason of Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TWENTY-FIFTH CAUSE OF ACTION

**Against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper**
**(Common Law Fraud)**

419. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

420. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting thousands of fraudulent charges through Body & Soul for the Fraudulent Services.

421. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Body & Soul was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were legitimately performed, when, in many cases, they were not legitimately performed.

422. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dragon Clinic that were not reimbursable.

423. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $877,000.00 pursuant to the fraudulent bills that were submitted by Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper through Body & Soul.

424. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

425. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper**
**(Unjust Enrichment)**

426. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-232, above.

427. As set forth above, Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

428. When GEICO paid the bills and charges submitted by Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper through Body & Soul, it reasonably believed that it was legally obligated to make such payments based on Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper's improper, unlawful, and/or unjust

acts.

429. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

430. Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

431. By reason of the above, Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper have been unjustly enriched in an amount to be determined at trial, but in no event less than $877,000.00.

## JURY DEMAND

432. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgement be entered in their favor:

A. On the First Cause of Action against Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Tampa Bay Services, Treat & Release, H&S Rehab, MJ Rehab, and Body & Soul has no right to receive payment for any of the pending bills submitted to GEICO.

B. On the Second Cause of Action against Padron, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,632,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C. On the Third Cause of Action against Padron and Tepper, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,632,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

D. On the Fourth Cause of Action against Tampa Bay Services, Padron, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $1,632,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E. On the Fifth Cause of Action against Tampa Bay Services, Padron, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $1,632,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F. On the Sixth Cause of Action against Tampa Bay Services, Padron, and Tepper, more than $1,632,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G. On the Seventh Cause of Action against Orta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,270,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18

U.S.C. § 1964(c), plus interest.

H. On the Eighth Cause of Action against Orta, Robaina, Raymond, and Tepper, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,270,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

I. On the Ninth Cause of Action against Orta, Robaina, Raymond, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $2,270,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

J. On the Tenth Cause of Action against Orta, Robaina, Raymond, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $2,270,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

K. On the Eleventh Cause of Action against Orta, Robaina, Raymond, and Tepper, more than $2,270,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L. On the Twelfth Cause of Action against Suarez and Humpierre, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,002,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

M. On the Thirteenth Cause of Action against Suarez, Humpierre, and Tepper, compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $1,002,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

N. On the Fourteenth Cause of Action against H&S Rehab, Suarez, Humpierre, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $1,002,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

O. On the Fifteenth Cause of Action against H&S Rehab, Suarez, Humpierre, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $1,002,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

P. On the Sixteenth Cause of Action against H&S Rehab, Suarez, Humpierre, and Tepper, more than $1,002,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Q. On the Seventeenth Cause of Action against Jimenez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $151,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

R. On the Eighteenth Cause of Action against Jimenez and Tepper compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $151,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

S. On the Nineteenth Cause of Action against MJ Rehab, Jimenez, and Tepper compensatory damages in an amount to be determined at trial but in excess of $151,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

T. On the Twentieth Cause of Action against MJ Rehab, Jimenez, and Tepper compensatory damages in an amount to be determined at trial but in excess of $151,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

U. On the Twenty-First Cause of Action against MJ Rehab, Jimenez, and Tepper more than $151,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

V. On the Twenty-Second Cause of Action against Linares, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $877,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

W. On the Twenty-Third Cause of Action against Linares, Silva, Raymond, Fernandez, and Tepper, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $877,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest.

X. On the Twenty-Fourth Cause of Action against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $877,000.00, together with costs and reasonable

attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Y. On the Twenty-Fifth Cause of Action against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper, compensatory damages in an amount to be determined at trial but in excess of $877,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Z. On the Twenty-Sixth Cause of Action against Body & Soul, Linares, Silva, Raymond, Fernandez, and Tepper, more than $877,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: August 18, 2026

*/s/ Max Gershenoff*

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
**RIVKIN RADLER LLP**
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225
-and-
926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3226
Facsimile: (516) 357-3333
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
*Counsel for Plaintiffs*